| | | |
|---|---|---|
| IN THE MATTER OF THE ARBITRATION BETWEEN | * | AAA CASE NO.: 01-16-0001-4773 |
| | * | |
| | * | |
| | * | |
| | * | |
| ALPHA-BRAVO CONTRACTING EMPLOYER | * | CLAIM: WITHDRAWAL LIABILITY |
| | * | |
| | * | |
| | * | |
| AND | * | ISSUE: MOTIONS |
| | * | |
| | * | |
| | * | |
| YANKEE ZULU | * | |
| JOINT PENSION TRUST | * | ARBITRATOR'S FILE NO: 2016-3501 |


## OPINION AND AWARD

### ARBITRATOR: JACK CLARKE

### AWARD DATE: APRIL 28, 2017

### APPEARANCES FOR THE PARTIES

**EMPLOYER**

**TRUST**



## **PROCEDURAL HISTORY**

ALPHA-BRAVO Contracting Company is hereinafter referred to as "Employer". The XRAY-ZULU JOINT PENSION TRUST is hereinafter referred to as "Trust".

In 1996, the Employer became signatory to a Project Agreement with the _____ Union _____, which required the Employer to contribute to a predecessor of the Trust.[1]

[John Doe], Esq., counsel for the Trust, addressed a letter to [Roger Doe], identifying [Roger Doe] as Director of the Employer, dated September 18, 2015.[2] John Doe advised that the Trust had "determined that ALPHA-BRAVO has withdrawn from the Trust in 2009 and, through the use of nonunion subcontractors to perform covered laborers work within five years thereafter, lost the protections afforded by MPPAA's construction industry rules." On behalf of the Trust, John Doe demanded that the Employer pay withdrawal liability in the amount of $826,009.[3] [John Doe] also set out a payment schedule. The Employer made its first four payments but refused to make its October 1, 2016 payment.[4]

By letter dated October 28, 2015, [Paul Doe], Esq., counsel for the Employer, requested that the Trust review its assessment of withdrawal liability.[5] [Paul Doe] contended

---

[1] Exhibit 1 to Employer's Memorandum in Support of Its Motion for Summary Judgment.

[2] Exhibit 10 to Employer's Memorandum in Support of Its Motion for Summary Judgment.

[3] [John Doe] noted: "The calculation will be revised once the 2014 withdrawal liability pool is confirmed."

[4] The Employer's history of interim payments is based on the factual recitation set out in the Trust's Motion to Compel ALPHA-BRAVO Contracting Company to Remit Interim Payments and the Employer's Memorandum in Opposition of the Respondent's Motion to Compel Interim Payments.

[5] Exhibit 11 to Employer's Memorandum in Support of Its Motion for Summary Judgment.

(1) that the Trust had "failed to notify the employer of the amount of liability 'as soon as practical' under ERISA § 4219(b)(1)";

(2) that "the construction industry exemption under ERISA section 4203(b) applies and ALPHA-BRAVO has not withdrawn from the Trust";

(3) if the Employer had withdrawn, "the calculation of its withdrawal liability is incorrect, the date of withdrawal is incorrect and the actuarial assumptions of the Plan are unreasonable;" and

(4) "ALPHA-BRAVO has been prejudiced by the unreasonable delay of notification of the assessment of withdrawal liability and asserts the defense of laches to any imposition of withdrawal liability."

On April 22, 2016, the Employer filed a Notice of Intent to Arbitrate with the Novi, Michigan office of the American Arbitration ("AAA"). Jack Clarke was selected as Arbitrator.

Counsel for the parties and the Arbitrator conferred via telephone conference call on June 10, 2016, and the Arbitrator issued a Memorandum Order on that same date.[6] The Arbitrator also issued a Protective Order dated February 20, 2017 and an Interim Order set out in an email dated March 1, 2017. The Memorandum Order of June 10, 2016, as amended; the Protective Order: and the Interim Order of March 1, 201 are adopted by reference and incorporated herein as if set out in full at this point.

On February 14, 2017, the Employer filed a Motion for Summary Judgment, with a supporting memorandum, exhibits and authorities, and a Motion to Stay Discovery

---

[6] The deadlines set out in the June 6, 2016 Memorandum Order were later extended by agreement of the parties and the Arbitrator.

Pending Resolution of the Motion for Summary Judgment, with authorities. On February 27, 2017, the Trust filed a Notice of Nonopposition to Employer's Motion to Stay Discovery Pending Resolution of the Motion for Summary Judgment. The Arbitrator granted the Motion to Stay in the Interim Order of March 1, 2017.

The Trust filed a Motion to Compel ALPHA-BRAVO Contracting Company to Remit Interim Payments, with exhibits, on February 16, 2017.

On March 7, 2017, the Employer filed a Memorandum in Opposition of the Respondent's Motion to Compel Payment of Interim Payments, with exhibits; and the Trust filed an Opposition to ALPHA-BRAVO Contracting Company's Motion for Summary Judgment and Countermotion for Continuance of the Motion to Allow Adequate Discovery and Order Compelling ALPHA-BRAVO to Comply with Discovery Requests, with exhibits and authorities.

On March 20, 2017, the Employer filed a Reply in Support of Its Motion for Summary Judgment, with exhibits and authorities; and the Trust filed a Reply in Support of Motion to Compel ALPHA-BRAVO Contracting Company to Remit Interim Payments, with authorities.

## BACKGROUND

Set forth in this Background are facts as stated in the Employer's Memorandum in Support of Its Motion for Summary Judgment and the Trust's Opposition to ALPHA-BRAVO Contracting Company's Motion for Summary Judgment.[7] In the latter document, the Trust did not challenge the Employer's statement of facts, with one exception.[8] The Trust clarified some facts noted by the Employer and set out additional ones, however. In its Reply in Support of Its Motion for Summary Judgment, the Employer did not challenge the clarifications or additions noted by the Trust.

The Employer is a construction manager and general contractor engaged in the building and construction industry in the States of ___ and ____ and elsewhere.

In 1996, the Employer became signatory to a Project Agreement for the Showcase Mall with the ____ Union _____ (hereinafter "Union"), which required the Employer to contribute to a predecessor of the Trust.

---

[7] The Arbitrator has omitted facts arguably relevant to the Trust's Countermotion for Continuance of the Motion to Allow Adequate Discovery and Order Compelling ALPHA-BRAVO to Comply with Discovery Requests because of the decision set out in the Discussion and Award below.

[8] The exception was that the Trust argued that the Employer had not submitted proof sufficient to show that it and The CHARLIE-DELTA Company were under common control at times pertinent to this withdrawal liability claim. In an email dated April 10, 2017, the Arbitrator stated that a document submitted in support of the Employer's Motion for Summary Judgment and Reply "evidences that the Employer owne[d] 98% of CHARLIE-DELTA Construction Company LLC as of September 3, 2012. However, as the Trust noted in footnote 1 of its Opposition to ALPHA-BRAVO Contracting Company's Motion for Summary Judgment, that document does not evidence that ALPHA-BRAVO owned CHARLIE-DELTA Construction Company LLC at times relevant to the Employer's Motion for Summary Judgment." The Arbitrator allowed the Employer time to submit additional documentation, which it did via email dated April 20, 2017. In an email dated April 24, 2017, counsel for the Trust stated that it did not have any contrary evidence. The Arbitrator is satisfied and finds that the Employer and CHARLIE-DELTA Construction Company LLC were under common control at all times pertinent to this withdrawal liability claim.

In 1979, the Employer and the Union executed a Memorandum Agreement in which the Employer agreed, among other things, "to comply with all of the terms, including wages, hours, and working conditions, as set forth in the Master Agreement, any future modifications, changes, amendments, supplements, extensions or renewals of or to said Master Agreement which may be negotiated between the parties thereto for the term thereof." The Master Agreement noted is the Master Labor Agreement between the Union and the _____ Contractors Association effective July 1, 1998.

On July 14, 1999, the Employer confirmed it would assign its work in accordance with the Master Labor Agreement.

The Employer caused members of the Union to be dispatched to all its projects thereafter, including, for example, the ____, _____ and the _____.

The Master Labor Agreement required the Employer to contribute to the Trust, referred to in the Master Labor Agreement as "Pension Plan A," and it made those contributions on behalf of its laborers for many years.

The Master Labor Agreement between the Union and the _____ Contractors Association in effect in 2008 was effective from 2005 to 2010.

On June 6, 2008, the Employer, the Union and The CHARLIE-DELTA Company (hereinafter "CHARLIE-DELTA") executed an Agreement (hereinafter "June 6, 2008 Agreement"), which provided in part:

> 1. ALPHA-BRAVO, the parent Company, is a Construction Manager and General Contractor engaged in the building and construction industry. The parent Company has established CHARLIE-DELTA, a subsidiary, which will furnish workers to ALPHA-BRAVO and such workers will engage in work within Union's jurisdiction.
>
> 2. CHARLIE-DELTA shall become a signatory to the current Labor Agreement ("Labor Agreement") binding CHARLIE-DELTA to the

current Laborers' Master Agreement between the United Builder's and Contractors Association and the Laborer's International Union of North America Local Union No. 872 ("Master Agreement"). CHARLIE-DELTA shall not, at this time, be a member of any multi-employer bargaining association, but shall sign the Master Labor Agreement as a non-association company.

      3.     It is understood that ALPHA-BRAVO shall not be bound to the Master Labor Agreement by virtue of this Agreement or through CHARLIE-DELTA signing the Labor Agreement.

      4.     The parties further agree that no language of the Labor Agreement shall be interpreted to make ALPHA-BRAVO a party to the Master Labor Agreement or to prohibit the arrangements described above. This includes, but is not limited to, any Article or portion thereof, in the Master Labor Agreement, any successor Master Labor Agreement and any ruling, decision and/or interpretation of the present or future Master Labor Agreement by any entity (including, but not limited to, arbitrator, court, NLRB, benefit fund, et cetera).

      5.     The parties agree that nothing in any trust agreement, benefit plan, summary plan description, subscription agreement, fund rules or regulation or other document relating to an employee benefit plan shall apply to ALPHA-BRAVO as long as ALPHA-BRAVO is not signatory to any collective bargaining agreement with the Union.

      ….

      7.     It is understood that neither the Labor Agreement nor Master Labor Agreement shall supersede or invalidate this Agreement. It is further agreed that this Agreement is a condition precedent to execution of the Master Labor Agreement by the subsidiary and that if, for any reason, this Agreement shall become void and unenforceable, CHARLIE-DELTA shall be released from the Labor Agreement and Master Labor Agreement. This Agreement shall continue in effect as long as the subsidiary is bound to the current Master Labor Agreement, and any successor Master Labor Agreements, with Union or its successors.

On June 6, 2008, CHARLIE-DELTA and the Union executed a Memorandum Agreement, which obligated CHARLIE-DELTA to abide by the then effective Master Labor Agreement.

CHARLIE-DELTA continued to be bound by the Master Labor Agreement through June 13, 2014 and continued to remit payments to the Trust.

The Employer remitted employee benefit contributions for the June, July, August and September 2008 work months to the Trust.

The Employer submitted Remittance Reports to the Trust through January 2010 and in August of that year. Each report contained the following statement:

> On behalf of the above stated employer, I certify and/or acknowledge the following:
>
> ….
>
> That this report is made pursuant to the appropriate project agreement, shop agreement, MLA, and/or any written agreements applicable to the Trust Funds as required by Section 302(c)(5)(B) of the "Labor Management Relations Act."

In its May 2009 remittance report to the Trust, the Employer indicated, for the first time, that it was inactive.

The Employer owned 98% or 99% of CHARLIE-DELTA at times pertinent to this claim.[9]

On September 18, 2015, the Trust sent the Employer an assessment for complete withdrawal liability in the amount of $826,009.

The Employer disputed the assessment, as noted in the Procedural History.

_____, Vice President & Equal Employment Opportunity Officer for the Employer, wrote a letter to the Union dated December 31, 2016, in which he wrote, *inter alia*: "As we collectively work to attain the required goals and benchmarks, we assure you of our

---

[9] See footnote 8.

cooperation, including recruiting and training new employees from within your approved apprenticeship programs."

On May 24, 2016, \_\_\_\_\_, Operations Manager for the Employer, wrote a letter to the Union in which he requested that the Union approve the sponsorship of a named individual into the Union.

## **DISCUSSION**

The briefs of the Employer and the Trust show that both agree regarding the burden of proof and standards that an arbitrator should apply in deciding a motion for summary judgment, and the Arbitrator concurs. It is not necessary to discuss either at length.

### **MOTION FOR SUMMARY JUDGMENT**

The Employer contends that application of 29 U.S.C. § 1301(b) to the facts of this case prevented a complete withdrawal when it ceased to be obligated to make contributions to the Trust in 2008.[10] Specifically, the Employer contends that because it owned 98% of CHARLIE-DELTA at pertinent times, the two entities were then under common control and thus must be treated as a single employer for the purposes of determining withdrawal liability. The Employer further contends that because CHARLIE-DELTA continued to be obligated to and did make contributions to the Trust, it (the Employer) did not completely withdraw, citing 29 U.S.C. § 1383(a). The Trust contends that it is entitled to a rebuttable presumption that its determination of the Employer's withdrawal liability is correct, citing 29 U.S.C. § 1401(a)(3)(A) and *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 113 S. Ct. 2264, 2283, 508 U.S. 602, 629 (1993). The Trust contends that a threshold issue is whether the Employer ever ceased to have an obligation to contribute to the Trust, citing 29 U.S.C. § 1383(b)(2). In this regard, the Trust contends:

> ALPHA-BRAVO claims that the 2008 Abrogation Agreement ended its obligation to contribute. If that is not true, ALPHA-BRAVO remains obligated

---

[10] The Arbitrator has used the U.S. Code citations to pertinent parts of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) instead of the sections of the Act because the former is more accessible.

Page 9

to contribute to the Trust and this case is moot (though ALPHA-BRAVO may owe back contributions of course). Any dispute regarding whether ALPHA-BRAVO ceased to be obligated to contribute as that term is used in § 1383 must be resolved in this arbitration. 29 U.S.C. § 1401 (covering disputes arising under §§ 1381-1399). Although ALPHA-BRAVO has thus far prevented the taking of its deposition, this issue must be explored and resolved.

The Trust further contends:

This case is awash in unresolved material issues of fact. Was the Abrogation Agreement valid and a potential withdrawal in 2008? Did ALPHA-BRAVO thereafter obligate itself to contribute to the Trust again by remitting contributions and signing certifications that it was signatory? Is the Trust correct that ALPHA-BRAVO actually withdrew in 2009 when it designated itself "inactive?" After certifying its signatory status dozens of times since its alleged abrogation, is ALPHA-BRAVO in fact still signatory to this day?

Although apparently no case having ever so held, is the existence of a subsequent signatory entity, allegedly within a control group, a shield against withdrawal liability? Or is such an arrangement a transaction with a principal purpose to evade and avoid liability, especially in the face of the Great Recession and the unfunded liability it caused? If Whiting-Turner and CHARLIE-DELTA are indeed in a control group, was there a partial withdrawal instead of a complete withdrawal? How much nonunion work did ALPHA-BRAVO perform through subcontractors and when, so that the partial withdrawal liability rules and construction industry rules can be applied?

### WHETHER THE EMPLOYER COMPLETELY WITHDREW

Twenty-nine U.S.C. § 1401(a) provides in part: "(1) Any dispute between an employer and the plan sponsor of a multiemployer plan *concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."* (Emphasis added.) Initially, the Arbitrator must determine the basis for the Trust's determination that the Employer completely withdrew.

Twenty-nine U.S.C. § 1383 provides in pertinent part:

§1383. Complete withdrawal

> (a) Determinative factors
>
> For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer-
>
> (1) permanently ceases to have an obligation to contribute under the plan, or
>
> (2) permanently ceases all covered operations under the plan.
>
> (b) Building and construction industry
>
> (1) Notwithstanding subsection (a), in the case of an employer that has an obligation to contribute under a plan for work performed in the building and construction industry, a complete withdrawal occurs only as described in paragraph (2), if-
>
> (A) an employer ceases to have an obligation to contribute under the plan, and
>
> (B) the employer-
>
> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or
>
> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

Although [John Doe's] September 18, 2015 letter did not specifically identify 29 U.S.C. § 1383(b)(2), [John Doe's] references to the "use of nonunion subcontractors" and loss of "the protections afforded by MPPAA's construction industry rules" leave no doubt that

Page 11

Case 2:19-cv-02780-EFM-GEB   Document 28-3   Filed 05/23/20   Page 13 of 17

the Trust's determination that the Employer had withdrawn was based on that provision.[11,12]

Twenty-nine U.S.C. §1301 "Definitions" provides in pertinent part:

> (b)(1) An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer, and a partnership is treated as the employer of each partner who is an employee within the meaning of section 401(c)(1) of title 26. *For purposes of this subchapter*, under regulations prescribed by the corporation, *all employees of trades or businesses* (whether or not incorporated) *which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer*. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of title 26. [Emphasis added.]

The Employer and CHARLIE-DELTA were under common control at times pertinent to this arbitration. Reading 29 U.S.C. § 1383(b)(2) consistently with §1301(b)(1), as the Arbitrator must, it becomes clear that the Arbitrator must deem CHARLIE-DELTA and the Employer to be a single employer for the purpose of applying § 1383(b)(2). As the Tenth Circuit has stated regarding that provision, "'employer' means a common-control group."[13] Under § 1383(b)(2), a complete withdrawal occurs only if the common control group ceases its obligation and either continues or resumes covered work within five year.[14] In the present case, the common control group did not cease to be obligated

---

[11] It is undisputed that the Employer's obligation was to contribute to a plan for work performed in the building and construction industry.

[12] The Arbitrator must reject the Employer's argument that 29 U.S.C. § 1383(a) applies to this case. Congress' use of the phrase "[n]otwithstanding subsection (a)" in 29 U.S.C. § 1383(b)(1) makes clear that it intended that subsection (a) have no application when subsection (b) applies.

[13] Ceco Concrete Construction, LLC v. Centennial State Carpenters Pension Trust, Nos. 15-1021, 15-1190 at p 17 (10th Cir. May 3, 2016).

[14] Id. at p 21.

to contribute to the Trust because CHARLIE-DELTA became obligated to do so on the same date the Employer withdrew from the then effective Master Labor Agreement. In other words, the control group was obligated to contribute to the Trust at all times relevant to this arbitration.[15] The Arbitrator concludes that the Employer did not completely withdraw from the Trust at any time pertinent to this arbitration.

## COUNTERMOTION

The Trust argues that it should be allowed time for discovery to obtain information relating to whether the Employer partially withdrew from the Trust, among other reasons. As noted above, 29 U.S.C. § 1401(a) provides that any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under §§ 1381 through 1399 of Title 29 shall be resolved through arbitration. The Trust has not determined that the Employer has partially withdrawn; therefore that issue is not before the undersigned Arbitrator. Any information regarding that issue that might be obtained through additional discovery would be irrelevant.

The Trust contends that it should be allowed time for discovery to obtain information relating to the *bona fides* of the June 6, 2008 Agreement under 29 U.S.C. § 1392(c), which provides: "If a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." The difficulty with the Trust's argument is that if it were able to show that the June 6, 2008 Agreement was entered into for the purpose of avoiding withdrawal liability, the result would be the same as that reached

---

[15] The Arbitrator need not and therefore will not discuss the June 6, 2008 Agreement. It is sufficient to note that neither individually nor collectively could the Employer, CHARLIE-DELTA and the Union modify any provision of MEPPA.

above, that is, the Employer would not have completely withdrawn. Discovery is not needed for an issue that cannot change the outcome of the case.

The Trust has cited other reasons in support of its countermotion. It is sufficient to state that the Trust has not identified any information that could modify the Arbitrator's finding that the Employer did not completely withdraw from the Trust at any time relevant to this arbitration. The Arbitrator will deny the Trust's Countermotion.

In summary, the Trust has not persuaded the Arbitrator of the existence of a sufficient reason to postpone ruling on the Employer's Motion for Summary Judgment to allow for discovery. The Arbitrator concludes that the Employer did not completely withdraw from the Trust at any time relevant to this arbitration. The Trust has argued that such a finding would result in its demand for withdrawal liability becoming moot. The Arbitrator need not and therefore will not determine if the demand is moot. Clearly the finding that the Employer has not completely withdrawn requires that the Arbitrator grant the Employer's Motion for Summary Judgment.

## MOTION TO COMPEL INTERIM PAYMENTS

Having determined to grant the Employer's Motion for Summary Judgment, the Trust's Motion to Compel ALPHA-BRAVO Contracting Company to Remit Interim Payments is moot. The Arbitrator will deny it accordingly.

## REMEDY

Having determined to grant the Employer's Motion for Summary Judgment, to deny the Trust's Countermotion, and to deny the Trust's Motion to Compel Interim Payments the Arbitrator must frame an appropriate remedy. The Arbitrator will direct the Trust to rescind its demand for withdrawal liability set out in [John Doe's] September 18, 2015

letter to [Roger Doe]. Because any payments made by the Employer were overpayments, the Arbitrator will direct the Trust to refund any payments made by the Employer with interest in a lump sum, the amount to be calculated in accordance with 29 CFR § 4219.31(d). The Arbitrator will deny the Trust's Countermotion for Continuance of the Motion to Allow Adequate Discovery and Order Compelling ALPHA-BRAVO to Comply with Discovery Requests. The Arbitrator will deny the Trust's Motion to Compel ALPHA-BRAVO Contracting Company to Remit Interim Payments as moot.

## **AWARD**

Having heard or read and carefully reviewed the evidence and argumentative materials in this case and in light of the above Discussion, the Arbitrator grants the Employer's Motion for Summary Judgment on the grounds that the Employer did not completely withdraw from the Trust at any time relevant to this arbitration. The Arbitrator directs the Trust to rescind its demand for withdrawal liability set out in [John Doe's] September 18, 2015 letter to [Roger Doe]. The Arbitrator directs the Trust to refund any payments made by the Employer with interest in a lump sum, the amount to be calculated in accordance with 29 CFR § 4219.31(d). The Arbitrator denies the Trust's Countermotion for Continuance of the Motion to Allow Adequate Discovery and Order Compelling ALPHA-BRAVO to Comply with Discovery Requests. The Arbitrator denies the Trust's Motion to Compel ALPHA-BRAVO Contracting Company to Remit Interim Payments as moot. The Arbitrator directs the Trust and the Employer to each pay its own attorney's fees. The Arbitrator directs the Trust and the Employer to each pay ½ of the fees of the American Arbitration Association and of the Arbitrator's fees and expense.

Dated: April 28, 2017

             Jack Clarke, Arbitrator
             Athens, Georgia

             _____